

# NUMBER 13-20-00277-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN RE THE COMMITMENT OF HAL VERNON PARFAIT

### On appeal from the 272nd District Court
### of Brazos County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Silva**
**Memorandum Opinion by Justice Silva**

The State of Texas filed a petition to civilly commit appellant Hal Vernon Parfait as a sexually-violent predator (SVP) under the Sexually Violent Predator Act (the Act).[1] *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.001–.151. Following a jury finding, the trial court entered a final judgment and order of civil commitment under the Act. *Id.* § 841.003. Parfait raises three issues on appeal: (1–2) the evidence was factually and legally

---

[1] This appeal was transferred from the Tenth Court of Appeals in Waco pursuant to a docket-equalization order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 74.001.

insufficient to support a finding that Parfait is an SVP, and (3) the trial court abused its discretion in its admittance of irrelevant and highly prejudicial evidence. *See* TEX. R. EVID. 401, 403. We affirm.

## I.    BACKGROUND

At trial, the State alleged Parfait had been convicted of more than one sexually violent offense and suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *See* § 841.003(a), (b). In support, the State provided evidence of Parfait's criminal history, which included several adjudicated and unadjudicated sexual assault offenses and non-violent convictions, as well as expert testimony to explain the correlation between Parfait's criminal history and his propensity for sexual violence.

### A.    Parfait

When questioned regarding his criminal history, Parfait testified that he did not "recall" whether he had been arrested for public intoxication in Jim Wells County, Angelina County, or Harris County. Although Parfait remembered pleading guilty in 1991 to aggravated sexual assault and burglary of a habitation, Parfait maintained that the encounter involving his then-wife's friend had been consensual. Parfait stated that the complainant "made this whole thing up" to "protect her marriage and probably her reputation in her church." Parfait specifically denied entering her apartment while she slept, threatening to harm her children, forcefully penetrating her vaginally, and cutting her telephone line to prevent her from calling law enforcement. Parfait stated he only pleaded guilty to secure "a better deal" than he believed he would have received if the

2

case had proceeded to trial. Parfait was sentenced to seven and a half years' imprisonment for the aggravated sexual assault.

Parfait testified that in 2000, two years after his release from prison, he was arrested on sexual assault charges involving, H.D.,[2] a "nine or ten"-year-old complainant. Parfait stated H.D. was his then-girlfriend's niece, who also resided across the hall from his apartment. Parfait testified that in May 2000, H.D. entered his apartment uninvited. Parfait denied watching a pornographic video or masturbating in her presence. Parfait further denied throwing H.D. onto the couch, climbing on top of her, rubbing his penis against her vagina, or touching her vagina with his hand. Parfait was found guilty of attempted sexual assault of a child and indecency with a child by exposure and sentenced to life and twenty years' imprisonment, respectively.

Following Parfait's testimony regarding his prior convictions, the State asked to approach the bench and informed the trial court of its intent to inquire about several unadjudicated offenses involving other minors and to introduce letters Parfait wrote while in custody. Parfait's trial counsel objected to the inclusion of the letters, arguing that they were not relevant and that one letter was more prejudicial than probative under Rule 403. *See* TEX. R. EVID. 401, 403. The trial court overruled Parfait's objections.

When confronted with sexual assault allegations stemming from an indictment involving a six-year-old child that predated the allegations involving H.D.,[3] Parfait testified

---

[2] To protect the identity of the minor child, we refer to the child by her initials. *See* TEX. R. APP. P. 9.8(a) cmt.

[3] Evidence of a dismissal order admitted at trial indicated that the cause involving the six-year-old child was dismissed following Parfait's conviction in the cause involving H.D.

3

he was "having a hard time remembering, recalling several things." Parfait acknowledged he previously refused to answer questions related to this indictment during a prior deposition based on his Fifth Amendment right against self-incrimination. Parfait denied rubbing the child's genitals with his hand and similarly denied allegations involving the child's siblings.

Regarding his conduct while he was in custody, Parfait admitted he had been "written up" twice over allegations that he masturbated in front of female correctional officers—first, during his imprisonment in the 1990s, and once more, recently. While in custody in the 1990s, Parfait was also reprimanded for sending unsolicited, sexually-charged letters to women whose addresses he obtained through unauthorized means. Parfait testified he had participated in a "Records Conversion Project,"[4] providing him access to personal information, including names and addresses, which he then used to write to women across the country.

One such letter (the Beverly letter), addressed to a woman named "Beverly," was admitted into evidence. The Beverly letter read in relevant part:

> If I'm late to wish you a wonderful and happy birthday, I still send you all my love and wishes anyhow. I really love your name, Bev. When I hear it—I melt. I cannot help it. I had a childhood sweetheart that name [sic], and she was everything. I moved and now she's gone. Only the name remains.
>
> . . . .
>
> Beverly, you are a woman; you've been married before. Lack of communication and a messed[-]up sex-life breaks a marriage up. Adultery does too, but[] that's beside the point. Anyhow, after a good workout, we could shower—together hopefully—and give each other a good massage. We could love one another in the shower too.

---

[4] Testimony at trial provided no clarity regarding what the project entailed.

4

. . . .

If you love poetry, I'd recite you poetry. I'm not sure about whips and chains though. But, I'd do whatever I could for you to make your life and sexual desires and fantasies become a fulfilled reality. If you are into sixty nine, then, I'm definitely game. If you only want to talk as I listen and hug you[,] so be it.

It can only be in letters at the moment; maybe later, I can get over to see you. Until then, correspondence is where it is at.

I hope you don't think I'm too forward or fast. Really I'm not. I just let it all or most out so you know where I'm at.

Really, if I could be there to rub in your Neutrogena to help keep your body skin soft and supple. Thinking on this, I wonder and fantasize how soft and warm your lovely lips must be.

. . . .

Lie still Bev [w]hile I prepare my future, [c]ertain hard days ahead, [w]hen I'll need what I know so clearly now[.] I am making use of the one thing I learned of all the things my father tried to teach me: [T]he art of memory[.] I'm letting this room, your bedroom, and your body presence in it stand for my ideas about love and its difficulties. I'll let your moans and love-cries, those precious [illegible] notes of a moment ago, stand for distance. Your scent, Bev, that lovely body scent of spice and a [illegible] I'll let stand for mystery. Your lovely belly is my daily cup of milk I drank as a boy before morning prayer. And one day, when I need to tell myself something intelligent about love, I'll close my eyes and recall your bedroom as I made passionate, romantic love to you as you moan in my ear. My body is estrangement. This desire, perfection. Your moans, your cries are song. Your hair, your thighs are a melody.

. . . .

Send some pictures, and we can start from there. If I was there right now, I would love to be making it with you or having to hear your pleasurable moans as I perform cunnilingus on you. Be sure to write me soon. I'll be waiting for you. . . .

Beverly reported Parfait, and the project was subsequently shut down.

In the months leading up to trial, Parfait was once more in communication with

women he did not know although he maintained that the communications had been solicited.[5] Parfait later admitted he had paid money to get strangers' addresses.

Parfait was also questioned regarding written assignments he completed while in custody during his sex offender treatment courses, including one which instructed him to "Think about the sexual crime you committed. List five examples of how thinking errors that you had led to behaviors that were involved in your sexual offense." Parfait read off his response, which stated in part: "The skirt you wear is sexy. I may be wrong, but you may want me to feel your thighs. You may. By always[,] by wearing short skirts, [sic] that you need another man in your life." Parfait testified that he "may have just totally misread the question" and denied having those thoughts.

Parfait stated that a recent onset of seizures, which first began in June 2014 when he was "actually diagnosed [sic] as at death or near death or dead," has affected his ability to recollect past events. Parfait also denied using any substances beyond alcohol or marijuana, maintaining that he quit both while he was incarcerated in the early 2000s because "they started adding rat poison and roach spray and everything else on there."

## B.    Darrell Turner

Darrell Turner, Ph.D., a clinical psychologist, was hired by the State to evaluate Parfait and assess whether Parfait suffers from a behavioral abnormality that predisposes him to engage in predatory acts of sexual violence. Dr. Turner testified he has completed

---

[5] Contrary to Parfait's testimony, several of the women Parfait wrote to submitted affidavits expressing their displeasure at having recently received unsolicited communications from Parfait. While the recently-written letters admitted at trial were not as sexually explicit as Parfait's letter to Beverly, Parfait continued to use language implying a preexisting relationship with the letters' recipients. In one such letter, he wrote: "Your letters are still G-O-N-E. All my food is lost. I'm sure someone has stolen my $85 worth of groceries. Oh well, my one delicious edible, I found—it's your address."

about 240 behavioral abnormality evaluations and does not always make a finding that an offender displays a behavioral abnormality.

Dr. Turner explained that, in a behavioral abnormality analysis, the record review process is essential to "create[] a preliminary profile of the offender," "to get an idea about how they have been able to control themselves thus far," and to determine "what their sexual interests are"—the latter of which is often obtained by "looking at who their victims are and how they perpetrated the offense." Dr. Turner testified that indicators of sexual deviancy and "the degree to which that offender is antisocial" are the "most powerful predictors of [a] sex offender's likelihood of re-offending." Sexual deviancy concerns "a sexual interest that would require victimizing someone in order to satisfy it." Dr. Turner described an "antisocial" individual as one who "doesn't feel empathy for other people" and may "victimize people without remorse."

On August 1, 2019, Dr. Turner met with Parfait for approximately two hours. Dr. Turner performed two examinations to assess Parfait's risk for recidivism: Static-99R and Psychopathy Checklist-Revised (PCL-R). With respect to the Static-99R, Dr. Turner testified that he scored the test, "noticed a mistake" after reviewing the file in preparation for depositions, and thereafter "rescored it." Parfait "scored a two," indicating an average risk for reoffending, a reduction from his original score of a five. Dr. Turner explained that he "wanted to be conservative" in his scoring, and did not, for example, count Parfait's in-custody public masturbation incidents against him. Parfait scored a 21 on the PCL-R,[6] indicating "a higher degree of psychopathy than the average male" and "about the same

---

[6] Dr. Turner explained the scoring ranges from 0 to 40, with a score of 26 to 30 indicating a high degree of psychopathy and a score of over 31 indicating a "severe degree of psychopathy."

7

degree of psychopathy as the average inmate." Dr. Turner testified that although Parfait's score was not particularly high, Parfait "talked about himself in an aggrandizing manner" and demonstrated manipulative and dishonest tendencies.

Using the Fifth Edition of the Diagnosis and Statistical Manual of Psychiatric Disorders (DSM-V), Dr. Turner ultimately diagnosed Parfait with unspecified paraphilic disorder with "presence of antisocial features"—"a diagnosis that indicates that [Parfait] is sexually deviant." Dr. Turner explained that a paraphilic disorder is the sexual attraction to an individual who is not "a consenting[,] of-age partner." Dr. Turner testified that he did not find evidence of antisocial behavior from Parfait's "younger childhood," and therefore, he did not have "enough to make a full diagnosis of antisocial personality disorder."

Dr. Turner pointed to Parfait's inconsistent and incomplete disclosures of his substance abuse history, military background, and medical history as specific examples of psychopathic and antisocial behavior. Dr. Turner testified that Parfait's self-reported "substance use history seemed to always be different," with Parfait admitting to heroin and methamphetamine use in "some cases" but only to marijuana and alcohol in others. Dr. Turner stated Parfait claimed he was unable to remember the terms of his discharge from the military, but a review of Parfait's military records revealed he initially received a "dishonorable discharge" after undergoing "repeated counselings." Regarding Parfait's medical history, Dr. Turner stated Parfait claimed to have a "history of [a] seizure disorder beginning about 2014," but there "was some evidence in the records" of Parfait of "exaggerating or manipulating his medical history." Dr. Turner testified that following one

8

incident, wherein Parfait reported falling down during a seizure, camera footage showed Parfait "slowly get down comfortably on the floor [and] lay down."

Dr. Turner additionally opined that Parfait's unsolicited communications while in custody were "excellent example[s] of conning and manipulative behavior" because Parfait's language appeared to "cater to whoever" was the recipient of the letter.[7] Dr. Turner testified that Parfait's letters were further problematic given that they occurred during the pendency of this case. "[W]hile he is going through this procedure to look at whether he has a behavioral abnormality that makes it hard for him to control his sexual behavior, he is writing sexual letters to women that he does not know," testified Dr. Turner. Dr. Turner surmised that Parfait's repeated disciplinary infractions for sexual misconduct while in custody also exemplifies how "difficult [it is] for him to control his sexual urges."

Dr. Turner stated that his diagnosis was likewise supported by evidence of Parfait's continued refusal to accept any personal responsibility for his adjudicated offenses and the alarming circumstances under which the second sexual assault offense against H.D. was committed. Dr. Turner testified, "Most sex offenders do not re-offend after being— after committing one sex offense and being caught and being sentenced . . ." Yet, despite having someone "whom [Parfait] could have sex with and ha[ve] a sexual relationship with" following his 1990 incarceration, Parfait sought "different children[8] to satisfy sexual

---

[7] While the letters to women were often sexual, Parfait also wrote to organizations, including a church, wherein he began his letter stating: "First of all, before we do anything, all praise to Jesus, praise to Jesus."

[8] Dr. Turner made repeated references to the indictment involving the six-year-old female.

9

urges." Dr. Turner stated that the fact the complainants in both cases were unrelated to Parfait also "makes him more likely to re-offend."

Dr. Turner additionally testified to protective factors, which are factors that mitigate or reduce the risk of recidivism, that he observed: Parfait's age, Parfait's completion of various coursework while in custody, and Parfait's familial support. Dr. Turner, however, testified to several "caveat[s]" to these protective factors. While Parfait's risk of re-offending is statistically decreased because of his advanced age, Dr. Turner testified that "clearly[,] his age isn't slowing him down" given that Parfait "was 45 [years old] when he committed the most recent offense" and continues to "writ[e] these predatory letters to these women." Moreover, Parfait's social support is "the same support that he had when he re-offended [in 2000]," and "it didn't really help him then." Dr. Turner further questioned the success of Parfait's sex offender treatment. "It's hard to say he's learning in treatment and doing well if he's writing letters that are scaring these women and making them feel like victims," testified Dr. Turner.

Dr. Turner ultimately concluded, based on his education, experience, and evaluation of Parfait, that Parfait suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. Dr. Turner testified that the methodology he employed in reaching his opinion abides by generally accepted standards in forensic psychology.

The jury unanimously found that Parfait is an SVP. The trial court rendered judgment on the jury's verdict and ordered Parfait civilly committed under the Act for treatment and supervision by the Civil Commitment Office. This appeal followed.

10

## II. SUFFICIENCY OF THE EVIDENCE

In his first two issues, Parfait contends that the evidence is legally and factually insufficient to support the jury's finding that he is an SVP because the testimony of the State's only expert witness, Dr. Turner, amounts to no evidence given that it is conclusory and speculative. We disagree.

## A. Standard of Review

Proceedings under the Act are civil in nature, but the State's burden of proof at trial is the same as in a criminal case. *In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020); *see In re Commitment of Bluitt*, 605 S.W.3d 199, 201 (Tex. 2020) (explaining the civil commitment process and purpose of the Act). In other words, the State must prove "beyond a reasonable doubt" at trial that the offender is an SVP. *Stoddard*, 619 S.W.3d at 674. However, on appeal, "both legal-and factual-sufficiency reviews of findings . . . must be proven by clear and convincing evidence." *Id.*

When reviewing a legal-sufficiency challenge to the evidence in an SVP case, we assess "the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* "[A]ll evidence that a reasonable factfinder could have disbelieved or found to have been incredible" must be disregarded. *Id.* (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). By contrast, under a factual-sufficiency review,

> rather than 'disregard' disputed evidence that a reasonable factfinder could not have credited in favor of the finding, the court must determine whether, in light of the entire record, that evidence 'is so significant that a factfinder could not reasonably have formed a firm belief or conviction' that the finding was true.

11

*Id.* (quoting *J.F.C.*, 96 S.W.3d at 266). Stated otherwise,

> the evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the SVP finding, along with the undisputed facts that do not support the finding, is so significant that the factfinder could not have found beyond a reasonable doubt that the statutory elements were met.

*Id.* at 675.

## B.    Applicable Law

As defined by the Legislature, an SVP is a person who "(1) is a repeat sexually violent offender; and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." TEX. HEALTH & SAFETY CODE ANN. § 841.003(a). With regard to the first element, a person is a "repeat sexually violent offender" if "the person is convicted of more than one sexually violent offense and a sentence is imposed for at least one of the offenses." *Id.* § 841.003(b). As relevant here, Parfait's prior convictions for aggravated sexual assault in 1991 and attempted sexual assault of a child in 2001 constitute sexually violent offenses. *See id.* § 841.002(8)(A), (E); TEX. PENAL CODE ANN. §§ 22.011, 22.021. For the second element, a "[b]ehavioral abnormality" is "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." TEX. HEALTH & SAFETY CODE ANN. § 841.002(2); *see In re Commitment of H.L.T.*, 549 S.W.3d 656, 661 (Tex. App.—Waco 2017, pet. denied).

The State may prove these elements through the testimony of a qualified expert witness. *See Stoddard*, 619 S.W.3d at 674; *H.L.T.*, 549 S.W.3d at 662–63; *see also In re*

*Commitment of Ovalle*, No. 13-19-00043-CV, 2020 WL 1467154, at *9 (Tex. App.—Corpus Christi–Edinburg Mar. 26, 2020, no pet.) (mem. op.) (overruling a legal and factual sufficiency challenge where the State presented the testimony of only one expert witness and the offender testified on his own behalf). However, where an expert offers only conclusory testimony, such testimony cannot support a judgment because "it does not make the existence of a material fact more or less probable." *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 786 (Tex. 2020); *see* TEX. R. EVID. 401 (defining relevant testimony). An expert's testimony is conclusory when the expert asserts a conclusion with no support. *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 223 (Tex. 2019). The expert must link his or her conclusions to the facts, explaining the basis of his or her assertions. *Id.*

## C. Discussion

It is undisputed that Parfait is a repeat sexually violent offender as the Act defines that term. *See* TEX. HEALTH & SAFETY CODE ANN. § 841.003(b). Parfait complains only that the evidence is insufficient to support a beyond-a-reasonable-doubt finding that he suffers from the requisite behavioral abnormality. *See id.* § 841.003(a)(2). Specifically, he challenges the probative value of Dr. Turner's testimony, arguing that it amounted to no evidence in support of the jury's finding that he is an SVP. We disagree.

First, Dr. Turner testified about his credentials, which Parfait does not challenge on appeal and included conducting over 240 SVP evaluations. Second, Dr. Turner testified that he based his opinions on the methodologies used in accordance with his training and accepted standards in forensic psychology and that these methodologies

included a review of voluminous documents, a face-to-face interview with Parfait, and the consideration of commonly employed testing instruments, the PCL-R and Static-99R. Third, Dr. Turner explained that he rendered his diagnosis after considering Parfait's risk and protective factors. Risk factors included Parfait's unadjudicated and adjudicated history of perpetration of sexual offenses against a wide age-range of female complainants, Parfait's unsolicited sexually explicit letters to strangers, Parfait's reluctance to accept responsibility for any of the aforementioned events, and Parfait's continued manipulation and deception of others. Dr. Turner testified that these risk factors demonstrate that Parfait is a sexual deviant who directs his thoughts and acts in furtherance of sexually victimizing others, and he is likely to engage in a predatory act of sexual violence should he be released. According to Dr. Turner, existing protective factors carried little weight because the same protective factors existed prior to Parfait's commission of the 2000 offense, and they did not serve as a successful deterrence for recidivism then.

We conclude that the record provides support for Dr. Turner's opinions. Consequently, his opinions cannot be characterized as wholly conclusory or without any foundation. *See Stoddard*, 619 S.W.3d at 674; *see also, e.g.*, *In re Commitment of K.S.*, 622 S.W.3d 569, 574 (Tex. App.—Waco 2021, no pet.) (concluding the evidence was legally sufficient to support the jury's finding where the State's expert testified to her underlying basis for concluding Starks had a behavioral abnormality); *In re Commitment of Driggers*, No. 13-19-00158-CV, 2019 WL 6769878, at *6 (Tex. App.—Corpus Christi–Edinburg Dec. 12, 2019, no pet.) (mem. op.) (concluding "there was more than a scintilla

14

of evidence to support the jury's finding" where the State's expert "testified regarding all of the resources he consulted in forming his opinions, including criminal records, court records, parole records, prison records, depositions, his use of actuarial tests, and his interview with Driggers [and] then discussed the various risk factors he considered and how they affected his overall conclusion"). Furthermore, viewing the evidence in the light most favorable to the verdict, we conclude that the evidence was legally sufficient to support the jury's verdict. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.002(2), 841.003(a); *Stoddard*, 619 S.W.3d at 674.

The evidence is also factually sufficient to support the jury's verdict. *See In re Commitment of Lares*, 608 S.W.3d 41, 45 (Tex. App.—San Antonio 2020, no pet.); *H.L.T.*, 549 S.W.3d at 664. The only evidence to contradict Dr. Turner came from Parfait's own testimony. Parfait denied all sexual assault allegations and reports of indecent behavior while in custody, while paradoxically testifying that he would control his sexual urges by "stay[ing] away from bars, dance halls" should he be released from prison. Parfait testified that he had already "totally quit watching movies because of so much just open sex on TV, period, these days," and his previous convictions already "prohibited [him] from being around a whole bunch of variety of places." The jury was entitled to resolve conflicts and contradictions in the evidence by believing all, some, or none of the testimony presented. *See Stoddard*, 619 S.W.3d at 674; *K.S.*, 622 S.W.3d at 574. After considering the evidence presented to the jury in the light most favorable to the verdict, we conclude that a rational trier of fact could find that Parfait has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence, and the contrary evidence was not

15

so significant as to preclude such a finding. *See* TEX. HEALTH & SAFETY CODE ANN. § 841.003; *Stoddard*, 619 S.W.3d at 674. We therefore overrule Parfait's first and second issues.

## III. ADMISSION OF CERTAIN EXHIBITS

By his third issue, Parfait argues the trial court abused its discretion in admitting four letters he wrote to women while he was in custody. Parfait argues the letters "had no tendency to make it more or less probable that Parfait is a sexually violent predator, w[ere] of no consequence in determining whether Parfait is a sexually violent predator," and the unfair prejudice of the letters far outweighed their probative value. *See* TEX. R. EVID. 403. The State argues that Parfait's Rule 403 argument is not preserved for three of the four admitted letters.

### A. Standard of Review and Applicable Law

We review evidentiary rulings for an abuse of discretion. *In re Commitment of Gomez*, 535 S.W.3d 917, 927 (Tex. App.—Corpus Christi–Edinburg 2017, no pet.). A trial court abuses its discretion when it acts without regard for guiding rules or principles. *Id.* Evidence must be relevant to be admissible, and evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." TEX. R. EVID. 401; *Lares*, 608 S.W.3d at 47. Although relevant, evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. "Evidence is unfairly prejudicial when it has an

16

undue tendency to suggest that a decision be made on an improper basis, commonly, but not necessarily, an emotional one." *In re Commitment of Anderson*, 392 S.W.3d 878, 882 (Tex. App.—Beaumont 2013, pet. denied). "In applying Rule 403, factors that should be considered include the probative value of the evidence, the potential of the evidence to impress the jury in some irrational way, the time needed to develop the evidence, and the proponent's need for the evidence." *Id.*; *see, e.g.*, *In re Commitment of Regalado*, 598 S.W.3d 736, 743 (Tex. App.—Amarillo 2020, no pet.) ("[B]oth a person's adjudicated and unadjudicated criminal history and the facts underlying those offenses are pertinent to determining the existence of a behavioral abnormality and the likelihood of reoffending."); *see also In re Commitment of S.D.*, No. 10-17-00129-CV, 2020 WL 103721, at *5 (Tex. App.—Waco Jan. 8, 2020, no pet.) (mem. op.).

## B.   Preservation

At trial, the State tendered four letters for admission. While Parfait objected to the admission of all four letters "as to relevance," Parfait only objected to the Beverly letter under Rule 403. *See* TEX. R. EVID. 401, 403. Therefore, Parfait's argument on appeal that all four letters were unduly prejudicial under Rule 403 has not been preserved for our review. *See* TEX. R. APP. P. 33.1(a); *Kindle v. State*, No. 05-19-01268-CR, 2021 WL 2281665, at *5 (Tex. App.—Dallas June 4, 2021, no pet. h.) (mem. op., not designated for publication) (concluding a relevance objection did not preserve Rule 403 complaint). We address the relevancy of all four letters but only apply Rule 403 factors to the Beverly letter.

**C.     Discussion**

**1.     Rule 401**

Parfait asserts that the letters, however "cringeworthy" or "creepy," do not make it more or less likely that Parfait is an SVP—a fact of material consequence at trial. *See* TEX. R. EVID. 401; *Lares*, 608 S.W.3d at 47. We disagree. As Parfait notes in his brief, "[t]he women described the letters as gross, creepy, and scary," and "Dr. Turner found the recent letters particularly alarming because they were written at a time Parfait knew he had to go through this civil commitment case with the central issue being his ability to control his sexual behavior." As Parfait additionally acknowledges, "[Dr.] Turner referred to them multiple times, ascribing them to [Parfait's] 'antisocial behavior' and his 'inability to control himself.'" Dr. Turner, indeed, confirmed that he relied in part on the letters in reaching his expert opinion that Parfait suffers from a behavioral abnormality that makes Parfait likely to engage in a predatory act of sexual violence—thereby underscoring the evidentiary relevance of the letters. *See In re Commitment of Renshaw*, 598 S.W.3d 303, 316 (Tex. App.—Texarkana 2020, no pet.); *see also, e.g., S.D.*, 2020 WL 103721, at *5 (concluding that the trial court did not abuse its discretion in admitting evidence over appellant's relevance and Rule 403 objection when the State's expert testified he "consider[ed]" the evidence when conducting his evaluation of the appellant). Thus, the trial court did not abuse its discretion in concluding that the letters were relevant to the jury in weighing the testimony presented, including Dr. Turner's opinion that Parfait suffers from a behavioral abnormality. *See* TEX. R. EVID. 401; *Gomez*, 535 S.W.3d at 927.

18

## 2. Rule 403

As noted previously, the Beverly letter concerns the central issue at trial of whether Parfait suffers from a behavioral abnormality, and Dr. Turner's testimony indicated that he considered the letter in forming his overall opinion. *See In re Commitment of Stuteville*, 463 S.W.3d 543, 556 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) ("[T]he trial court could have reasonably concluded that the facts and details related to [Appellant's] offenses would be helpful to the jury in weighing [Appellant's] testimony and [the expert's] testimony, and in explaining the basis for [the expert's] opinion that [Appellant] suffers from a behavioral abnormality."); *In re Flores*, No. 13-17-00258-CV, 2018 WL 1755876, at *5 (Tex. App.—Corpus Christi–Edinburg Apr. 12, 2018, no pet.) (mem. op.) (concluding the same). Furthermore, when questioned at trial, Parfait denied or minimized any allegations of sexual deviancy—indicating that the probative value of the letter and the State's need for the letter were high. *See Stuteville*, 463 S.W.3d at 556; *Flores*, 2018 WL 1755876, at *5. Regarding the potential of the letter to irrationally impress the jury, we note that the Beverly letter contains no more obscene content than the facts surrounding Parfait's sexual assault convictions. *See Anderson*, 392 S.W.3d at 882; *Flores*, 2018 WL 1755876, at *5. Therefore, the trial court could reasonably have concluded that Parfait's statement was not unfairly prejudicial,[9] and it did not abuse its discretion in admitting the statement into evidence. We overrule Parfait's third issue.

---

[9] Parfait additionally asserts that the trial court failed to conduct a "Rule 403 hearing" on the record. However, a judge is presumed to engage in the required balancing test once Rule 403 is invoked, and the trial court's failure to conduct the balancing test on the record does not imply otherwise. *Williams v. State*, 958 S.W.2d 186, 195–96 (Tex. Crim. App. 1997) (noting once Rule 403 invoked, trial judge has no discretion not to engage in balancing test but is not required to sua sponte place findings or conclusions into the record); *In re Commitment of Terry*, No. 09-15-00500-CV, 2016 WL 7323299, at *11 (Tex. App.—Beaumont Dec. 15, 2016, no pet.) (mem. op.) (assuming the same in an SVP proceeding).

## IV.  Conclusion

We affirm the judgment of the trial court.

CLARISSA SILVA
Justice

Delivered and filed on the
31st day of August, 2021.

20